# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | | |
|---|---|---|
| United States of America | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 15 CR 50035-2 |
| James T. Woodford | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | Magistrate Judge Iain Johnston |

## ORDER

It is this Court's Report and Recommendation that defendant's motion to suppress [81] be denied. Any objection to this Report and Recommendation must be filed by 10/14/2016. Failure to do so may result in waiver of the issue on appeal.

## STATEMENT

Before the Court is a motion to suppress from defendant, James T. Woodford. In it, Woodford seeks suppression of eyewitness identification by way of a photographic lineup and "any corresponding testimony related thereto." This Court held a hearing on the matter on September 23, 2016 and accepted evidence, all of which was unopposed. The Court was also assisted by counsel's helpful pre-hearing memoranda. For the reasons which follow, the Court recommends that Woodford's motion be denied.

The facts in this case, at least as they relate to this motion, are generally undisputed. On July 30, 2015, a Phillips 66 gas station and convenience store in Rockford, Illinois was robbed by two men. The victim store clerk, the only eyewitness to the crime, immediately notified the Rockford Police Department and provided a statement to the officers. The victim described the first suspect as a Hispanic male, 20-25 years of age, 5'2", slim build, 135-140 pounds, and short wavy black hair. (This first suspect is allegedly defendant.) She also noted that he had a red and white bandana on his face, all black clothing, white crew socks on both hands, and was wielding a long arm. She gave a description of the second individual, who was later determined to be Dakota Diehl,[1] although that description is not relevant to the instant order. The first

---

[1] Diehl, Woodford's co-defendant, has reportedly provided a statement admitting to the Phillips 66 robbery, along with several others in the Rockford area, but purportedly has not implicated Woodford in this or any other criminal activity.

suspect demanded money from the victim while the second suspect took items from behind the cash register.

Surveillance cameras from the Phillips 66 recorded the robbery. Also, the video surveillance showed that an individual dressed similarly to the first suspect (minus the socks on his hands and the bandana) had earlier entered the Phillips 66 station and spoken with the store clerk. At that time, he asked the victim about a particular type of snack food. When interviewed later by the FBI, the victim indicated that the individual who spoke to her earlier in the evening had the same voice, hair, height, weight, and build as the first suspect. Twenty days after the robbery, two FBI agents showed the victim the photographic lineup that is the subject of defendant's motion. A different FBI agent selected the filler photographs.[2] The fillers all possessed Hispanic names.[3] Before showing the photographs, the FBI agents read the following instructions to her, which she then signed:

1. The witness will be asked to view a series of photographs.

2. It is just as important to clear innocent persons from suspicion as it is to identify guilty persons.

3. Individuals depicted in the photographs may not appear exactly as they did on the date of the incident because features such as head and facial hair are subject to change.

4. A photograph of the person who committed the crime may or may not be among the photographs being presented.

5. If the witness sees a photograph of the perpetrator, tell the investigator. The investigator will continue showing the witness the remaining pictures. If the witness sees a subsequent picture that makes the witness reconsider a prior identification, tell the investigator. After the witness has seen all the photographs, if the witness wants to see one or more photographs again, the investigator will show them again.

6. Whether or not the witness identifies a photograph as the perpetrator, law enforcement will continue to investigate the incident.

7. The witness need not pick anyone or be certain if he or she does pick someone. If the witness makes an identification, the investigator will ask how certain the witness is of the identification.

---

[2] "Fillers are non-suspects who are added to the lineup to provide the witness with choices." *Dennis v. Sec'y Pa. Dep't of Corr.*, No. 13-9003, 2016 U.S. App. LEXIS 15434, at *145 (3d Cir. Aug. 23, 2016) (en banc) (McKee, J., concurring).

[3] Although reports described Woodford as black, the victim described defendant as Hispanic.

The FBI agents who provided her with the photographic lineup were not involved in the investigation in any other capacity and were not told who, if anyone, in the lineup was a suspect or other person of interest in the investigation. One agent provided the photographs to the victim one at a time, and after each of her responses took the photographs away without comment and removed them from view. The process of displaying and removing the photographs occurred at a consistent pace. The other agent took notes during the process. When shown the first, second, fourth, fifth, and sixth photographs, the victim immediately responded "no." As to the third, she first requested to put that photograph to the side and come back to it after she had seen the rest. After she had been shown all six, the agents asked if she wanted to see any of the photographs again, at which time she stated that she was certain as to the ones she had rejected, but wanted to see the third one again. When she was given the third photograph again, the victim stated that she was "90% certain" that he was the robber when she looked the first time, but she wanted to set it aside and look again after she had an opportunity to picture the individual in her mind again. Additionally, she noted that his facial hair was different in the picture than it had been on the day of the robbery. Nevertheless, after the second opportunity to view the photographs, she identified the third one as the first suspect. The agents had her initial and date that photograph to memorialize her identification. The third photograph was Woodford's booking photo. The photo lineup contained the following pictures:

## 1



## 2



3



4



## 5



## 6



Woodford now seeks suppression of the victim's identification of him as the perpetrator by picking photograph 3 and any in-court identification thereafter as tainted. In particular, he makes three arguments: (1) the physical characteristics of the other five individuals are too dissimilar from Woodford's, (2) the victim was "no doubt influenced" by the arrest and court proceedings of Dakota Diehl, and (3) any in-court identification of Woodford is now tainted by the out-of-court photographic lineup such that any in-court identification testimony from the witness must be excluded.

## LEGAL STANDARDS

Eyewitness identification testimony violates a defendant's right to due process of law when it creates a "very substantial likelihood of irreparable misidentification." *Niel v. Biggers*, 409 U.S. 188, 198 (1972). Courts use a two-pronged approach to determine whether the identification evidence should be suppressed. First, defendant bears the burden of showing that the identification procedure used by law enforcement was "both suggestive and unnecessary." *Perry v. New Hampshire*, 563 U.S. ___, 132 S. Ct. 716, 724, 733 (2012).

Second, if defendant meets his burden under the first prong, the court examines the totality of the circumstances surrounding the identification procedure to determine if it is reliable irrespective of the suggestive procedure. *Perry*, 132 S. Ct. at 733. Factors to be considered in determining the reliability of the identification include: (1) the opportunity of the witness to view the offender at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the prior description of the offender; (4) the level of certainty exhibited at the confrontation; and (5) the length of time between the crime and the confrontation. *Biggers*, 409 U.S. at 199-200. "Suppression ensues only when there is a very substantial likelihood of irreparable misidentification—irreparable in the sense that the procedures of trial would not suffice to allow jurors to separate reliable from mistaken identifications." *United States v. Johnson*, 745 F.3d 227, 229 (7th Cir. 2014) (citation and quotation marks omitted). Nevertheless, the government bears the burden of showing that the identification was reliable. *See Cossel v. Miller*, 229 F.3d 649, 655 (7th Cir. 2000); *see also Colley v. Peters*, 814 F. Supp. 1390, 1397 (C.D. Ill. 1992) ("Generally, the burden of demonstrating reliability is on the government, though courts seldom speak of the issue.").

## DISCUSSION

Woodford initially argues that the photograph lineup itself was unduly suggestive and unnecessary. Because of the Court's resolution of the question of reliability, it need not reach the issue. However, the Court is concerned about the discrepancies between Woodford and the other individuals in the lineup. Other than Woodford, all of the other individuals appear to be either Hispanic or Latino, while police reports identify Woodford as black. (However, critically, the victim described the first suspect as Hispanic.) Moreover, Woodford's face is a different shape than the rest, who all have rounder and fuller heads while his head is more diamond shaped and

much more slender. Furthermore, his hair appears to be longer and curlier than any of the other individuals. Finally, he is the only individual in the lineup with deeply sunken and shaded eyes; a distinct difference the Court finds critical. Individually, each of these traits does not strike the Court as problematic. However, in combination, the Court is concerned as to the potentially suggestive nature of the lineup. Most reasonable people viewing the photographs above would quickly notice that Woodford's appearance is dissimilar to the fillers.

Nevertheless, even if the Court were to conclude that the photographic lineup was unduly suggestive in this case, the Court would still recommend that the evidence not be suppressed. The victim in this case had two opportunities to view the individual she believed robbed her; one with him masked and one with him unmasked, both for a moderate period of time. In both situations, the surveillance videos make it clear that the victim was not paying attention to anything except the first suspect, to the extent that she barely glances at the other suspect, during the robbery and she looks directly at the individual in the earlier encounter to answer his question. The victim's prior description of the robber is also very close, in height, build, age, and clothing; only getting wrong Woodford's ethnicity. Moreover, the victim reported strong certainty, 90%, when she first viewed Woodford's photo and then, upon a requested second viewing, upped that determination to apparently complete certitude. Finally, it was less than three weeks from the incident to the date of the identification. Thus, the *Biggers* factors generally weigh in favor of a finding that the identification was reliable.

However, there are other indications of reliability. Notably, the FBI agents provided the photographs in the array to her sequentially, which the Seventh Circuit has expressed a preference for as a method for increasing identification reliability. *See Johnson*, 745 F.3d at 228. Moreover, the agents involved in showing the victim the lineup were not a part of the investigation and did not know which photograph, if any, depicted the person of interest in the investigation, and thus were not able to, consciously or subconsciously through some act, suggest to the victim that photograph she should choose. Furthermore, the victim read and signed the instructions which gave her clear guidance not to pick the best fit, but only the person who actually committed the crime. Finally, one of Woodford's biggest complaints about the photographic array actually cuts towards greater reliability: the victim herself identified the first suspect as Hispanic or Latino, and thus the fact that Woodford was the only black individual in the photographic array makes it more, not less, likely that the identification was reliable. Despite remembering the robber as Latino or Hispanic, she chose the only non-Latino or Hispanic individual in the lineup.

Woodford notes that the victim took two looks at the photograph before positively identifying it and argues that this shows that she hesitated in her identification, thereby making it less reliable. Although that is one possibility, a more

reasonable interpretation that she was being extra cautious after being told how important it was to correctly identify the suspect. This is exactly the kind of issue cross examination at trial is designed to explore and permit argument on, but is not, at least in this case, a good basis for suppression of this unquestionably relevant evidence. *See United States v. Williams*, 522 F.3d 809, 811 (7th Cir. 2008) ("Misidentification is 'irreparable' when the source of the error is so elusive that it cannot be demonstrated to a jury, which therefore will give excessive weight to the eyewitness testimony. . . . Unless the misidentification is irreparable, there is no basis for blocking the testimony. Perceptual biases and errors are endemic to identification. The normal way of dealing with them is to expose the problem at trial so that a discount may be applied to the testimony, rather than to exclude relevant evidence." (citation omitted)).

Woodford's other argument concerning reliability—that the victim was influenced in some way by the news coverage of Diehl's arrest—is without basis in the record. Nothing in the record mentions the scope of this alleged media coverage nor is there any indication that the victim was ever privy to whatever media coverage existed. Indeed, the agents all specifically testified that she never mentioned any media coverage to them concerning Diehl. Thus, this attack on the reliability of the identification also fails.

In short, then, the things which Woodford complains of are good grounds for cross examination, and this Court finds no good reason to upset the normal way to deal with identification issues—cross examination at trial. *See id.* Accordingly, this Court recommends that Woodford's motion be denied.

Entered:     September 28, 2016     _____

                                                        Iain D. Johnston
                                                        U.S. Magistrate Judge